OPINION OF THE COURT
BARRY, Circuit Judge:
Our criminal justice system is bottomed on several unwavering principles. One of those principles was recognized long ago by Justice Sutherland when he stated that a prosecuting attorney
is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
Berger v. United States, 295 U.S. 78, 88-89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), overruled on other grounds, Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Justice Sutherland’s words continue to guide us.
I.
John William Dunn inflicted grievous injuries on his infant son. In exchange for his plea of nolo contendere, the prosecutor promised, among other things, to recommend a minimum sentence within the standard guideline range of 36-60 months. At sentencing, however, the prosecutor did not mention the standard guideline range, much less a minimum sentence within that range, arguing instead that while she could not ask the Court to impose the “maximum possible penalty,” “a lengthy term of incarceration is necessary” — a “penalty that’s considerable.” Dunn was sentenced to seven and one-half to twenty years imprisonment. He argues, and we agree, that the prosecutor did not adhere to the terms of the bargain she struck with him. We further find that the state court unreasonably applied clearly established Supreme Court caselaw, and that the District Court erred in concluding otherwise. Accordingly, we will reverse.
Dunn was charged with aggravated assault, simple assault, reckless endangerment and endangering the welfare of a child stemming from his February 10,1992 assault on his two month-old son, John. On that day, Dunn was left to care for his son while his wife was at work. When Mrs. Dunn returned home in the evening, she found her son moaning, rigid and non-responsive. The infant’s head was limply hanging down and to the right, and his eyes were half-closed. When pressed as to what happened, Dunn became angry *452 and when he learned his wife had called the pediatrician, he became enraged and shattered a living room window. He initially refused to drive Mrs. Dunn and his son to the pediatrician’s office, acquiescing only when she threatened to call a lawyer.
After examining the infant, the pediatrician immediately admitted him to the hospital. The next day, Dunn admitted to Detective Dean Schwartz that his son had been crying and that Dunn had “lost it,” became frustrated, and “started to strike the child harder and harder and harder.” A471. He said that after he struck his son, he wrapped him in a blanket, put him in his crib, let him cry for hours, and never sought medical treatment. In what can only be described as a massive understatement, he posited that perhaps he was not the best person to watch a sick infant because he was a recovering alcoholic.
The infant was diagnosed with shaken baby syndrome and remains severely disabled to this day. At the time of sentencing, Mrs. Dunn testified that her then-fifteen month old son requires continual nursing care at home because he suffers seizures, cannot see, is in tremendous pain, is fed through a gastrointestinal tube, vomits all the time, is at constant risk of aspirating on his own mucous, has his blood drawn constantly, cries for several hours at a time, and is unable to grab for a toy, sit up, roll-over or even reach for his mother. At that time, it was expected that death was imminent. Despite the grave prognosis, John Dunn is now 8 years old, with permanent brain damage and facing numerous surgeries.
Dunn was released on bail shortly after his arrest and filed a motion to suppress his incriminating statement. Pursuant to an unwritten plea agreement and, coincidentally, on the one-year anniversary of the assault, Dunn withdrew that motion and pleaded nolo contendere to aggravated assault and endangering the welfare of a child. That agreement was described at the plea hearing in the following colloquy between the prosecutor and the Court:
[Prosecutor] ... There is an agreement of sorts in this case, Judge.
The Commonwealth is going to be requesting, the Court impose consecutive sentences on the two counts, as they do not merge. However, I’d like for the sentencing in the endangering to be a consecutive term of probation, so that after any parol [sic] supervision is terminated, we have an extra period of supervision on this defendant.
Court: All right. It’s my understanding, Mr. Dunn—
[Prosecutor] Judge, there’s one more thing. The Commonwealth is recommending a minimum in this case on Count 1 within the standard range, standard guidelines range, but that is not binding on the Court.
A460-A461. The Court later explained to Dunn:
Court: Now, what is not binding on the Court and is left totally to the discretion of the Court as far as sentencing, the Commonwealth indicates that they will recommend consecutive sentences. There will be a recommendation of a sentence of a minimum which would be in the standard range, and that the second, the endangering the welfare of children, would be a sentence of probation. However, that is not binding on the Court in any way. That is something which is entirely up to the Court, that your counsel has indicated—
*453 [Defense Attorney]: Judge, if I could just interrupt. That isn’t what the plea bargain is. The probation on the consecutive on the endangering is binding.
Court: Is that binding?
[Prosecutor] Yes, Judge, I’d like to see some extended supervision of this defendant after any kind of jail and parole supervision.
Court: What you’re saying is that the Commonwealth is requesting, but you said it wasn’t binding.
[Prosecutor] Judge, the sentence as to Count 1, aggravated assault, is there — there is a non-binding recommendation. As to Count 4, I’d like to see [a] binding recommendation to probation because I would like to ensure extended supervision.
Court: All right. Now, let’s go through that again so there’s no misunderstanding here. As I indicated, a plea of nolo contendere to Count 1 and count 4. The aggravated assault and the endangering the welfare of children, that the other two counts would be withdrawn. Likewise, binding on the Court would be that it would be a consecutive sentence, the second sentence being the endangering the welfare of children, and binding on the court would be that it be a sentence of probation on that charge. Now, if we were not to accept that binding agreement which we have not participated in, then you would have a right to withdraw your plea of guilty.
Now, the Commonwealth has recommended, but it is not binding on the Court, that on the charge of aggravated assault that the sentence be — that the minimum sentence be in the standard range of sentencing. However, as your counsel indicated, it’s not binding, and the sentence could be less than that and likewise, it could be even more. Do you understand that?
Dunn: Yes, Your Honor.
A462-A464.
Dunn was sentenced on April 8, 1993. At the beginning of the sentencing proceeding, the contours of the plea agreement were again articulated by the sentencing judge who clearly understood what — at least at that point in time — the Commonwealth’s recommendation was expected to be.
Court: At the time of the entry of the plea, there was a plea bargain arrangement that the counts of recklessly endangering another person and the simple assault would be withdrawn. The Commonwealth also indicated that they would recommend a minimum sentence in the standard range, although this was not binding on the Court. In this instance, the range would be 36 to 60 months. So it was the Commonwealth’s recommendation that the minimum sentence be in that range, but that it was not, as I indicated, not binding on the Court. There was a binding agreement that the sentence on Count 4 run consecutive. However, that was to be a sentence of probation which was binding on this Court if the Court would accept the plea bargain arrangement.
*454 [To the Prosecutor] is that your understanding of the plea agreement?
[Prosecutor] Yes, your Honor.
Court: [To Defense Attorney] is that your understanding of the plea agreement?
[Defense Attorney] Yes, your Honor.
A87-A88.
The Court then heard testimony from a number of witnesses. For the Commonwealth, Mrs. Dunn testified that Dunn had a drug problem before they were married, had a drinking problem throughout their marriage, and was often physically abusive towards her. She also confirmed that pri- or to the February 10th incident, she told Dunn never to “shake a baby vigorously, because it can cause severe brain damage.” Detective Schwartz told the Court that he disagreed with the Commonwealth’s recommended sentence and recommended that Dunn be imprisoned for at least five years and as much as the legal maximum — “the steepest that the Court can give is what I recommend. It’s just an unbelievable case.” A419.
On Dunn’s behalf, his sister testified that Dunn needed to come to terms with what he did to his son as well as deal with his emotional and substance abuse problems. The chaplain at the Allentown Rescue Mission, where Dunn lived for some time during the pendency of his ease, testified that although Dunn was cooperative while living at the Mission, he was emotionally troubled, depressed and suicidal. The chaplain attributed Dunn’s emotional trouble to his stint in the United States Army and the death of his father. With respect to the assault on the infant, the chaplain indicated that Dunn did not understand how patting his son on the back to raise a burp could have caused severe brain damage. Another employee of the Rescue Mission also testified that Dunn was emotionally troubled. He said that Dunn still believed that his pats on his son’s back did not cause the infant’s severe brain damage and regretted not having the resources to prove that at trial.
Finally, Dunn testified that he did not know at the time that his son was injured. Indeed, he continued, he remained mystified that patting his son on the back could have caused such severe brain damage without leaving so much as a bruise. Dunn conceded his problems with drugs and alcohol as well as his unresolved feelings about his father’s death and hoped that he might one day live a normal life.
After hearing this testimony, the Court called upon counsel:
Court: Do Counsel wish to say anything further?
[Prosecutor] Yes, Judge. I answer your question yes and I don’t even know what to say, Judge. What I know is, I know the injuries of the child. I know the loss to the family. What I know is the reasons for this plea. I think it’s pretty clear that I wanted to resolve this in a plea. I didn’t want these parties, particularly, I didn’t want Grace [the mother of the infant] to go through trial, testimony, the possibility of any kind of verdict as the result of a trial. I wanted to be able to have this situation put behind everyone.
On the other hand, Judge, there is so much that I feel about this situation. I feel that we’ve heard a carload of excuses for his behavior, or for his condition, meaning the defendant. I don’t believe that the acts that occurred that Monday were intentional. Yet the statute *455 read[s] reckless. And by this reckless conduct, this child will never have a life. This mother will face a possibility of losing her child some day, prematurely, to say the least. She suffers with this child everyday, Judge, in a way that no one should ever have to suffer; watching a child in constant pain and discomfort.
And I have not heard, nor read anything, either in this proceeding, or in this presentence investigation, that demonstrates to me that this defendant has even the most remote understanding or compassion for that. All we hear about is him. I’ve not heard much about his concern for the child, his concern for their condition. You heard Grace talk about the fact that she is the sole support, now, for herself and her child. The medical situation worsens, the insurance situation worsens. And there’s not much care on the part of the defendant.
I’ve heard, ironically, this excuse. I don’t mean to minimize it, everyone has problems, that perhaps the death of his father plays in who he is. And all I can think of is, isn’t it ironic that here was the opportunity for this man to have his own son and to establish a different kind of father/son relationship. And that’s totally ruined and impossible. And so I don’t know that I can accept the relationship of a father and a son as an excuse for destroying another relationship between a father and a son.
I can’t ask you to impose the maximum possible penalty. That would go outside of what my initial recommendation was. And I think if I would have a chance to sit down and have a drink of water and calm myself, maybe I would even think that to ask for the absolute maximum is unjust. But I believe this was reckless conduct. Unfortunately, it resulted in irreparable devastation. But I think a lengthy term of incarceration is necessary to address what happened here, to get this man’s attention, to get his focus in line, as to what he has to do, what he did do, what he needs to do to move on with his life. And maybe to give this woman just five minutes of peace of mind....
I think that all of these parties have spoken from the heart, Judge, and I wouldn’t want to be in your shoes for all the tea in China. But I think that something has to be done. It’s unfortunate that I didn’t hear remorse. I heard remorse for one’s own situation, one’s own future. But I didn’t hear remorse for what happened here. And I can’t abide by that. And I’m very sorry that I didn’t hear that. And I would ask'that you consider, Judge, a penalty that’s considerable and one that will hopefully move this defendant’s behavior in line with what we find socially acceptable, because this is not.
A143-A146. The Court then sentenced Dunn on the aggravated assault charge to not less than seven and one-half years and not more than twenty years to be served in a correctional institution designated by the Deputy Commissioner for Treatment. On the endangering count, Dunn was sentenced to a consecutive term of five years’ probation. The Court explained that the sentence exceeded the guidelines because of Dunn’s violent past, the especially heinous nature of the crime, Dunn’s failure to seek medical assistance after the incident, and the prognosis that the infant would have a limited life.
Dunn thereafter filed a petition for post-conviction collateral relief challenging, among other things, his counsel’s failure to object to or seek a remedy for the prosecutor’s breach of the plea agreement at sentencing. In denying the petition, the Court explained that the Commonwealth *456 was obligated only to recommend a nonbinding sentence in the standard range. The Court stated that it was well aware of the Commonwealth’s recommendation and that the prosecutor’s request for a “lengthy” period of incarceration was consistent with the plea agreement because a sentence within the standard range was, indeed, lengthy.
Dunn appealed from the order denying his petition. The Superior Court affirmed, and found, as relevant here, as follows:
Initially, we note that a sentence in the standard range of the guidelines, as set forth at sentencing by the court, would have called for a term of imprisonment of three to five years imprisonment. This term can be viewed as “lengthy” in and of itself. Thus, by recommending a “lengthy” term of imprisonment the district attorney did not violate the terms of the plea agreement. Furthermore, three sentences before the contested remark, the district attorney stated, “I can’t ask you to impose the maximum possible penalty. That would go outside of what my initial recommendation was.” Thus, the district attorney clearly qualified the contested remark by indicating his [sic] recommendation was still intact.
A273-A274 (internal citation omitted). The Court further found that there was no prejudice because the sentencing court was well aware of the Commonwealth’s recommendation. The Supreme Court of Pennsylvania denied review.
Dunn filed a timely petition pursuant to 28 U.S.C. § 2254 in the U .S. District Court for the Eastern District of Pennsylvania again challenging the prosecutor’s conduct at sentencing. Adopting the report and recommendation of the Magistrate Judge, the District Court concluded that because the plea agreement permitted the Commonwealth to recommend a minimum sentence of between 36 and 60 months and such a sentence was “lengthy” compared to the mean minimum sentence imposed for aggravated assault, the prosecutor’s request for a “lengthy” sentence did not breach the agreement. Finding, however, that this conclusion was “by no means free from doubt,” the District Court sua sponte granted a certificate of appeal-ability.
II.
It is wholly understandable that the prosecutor was exasperated if not outraged following Dunn’s presentation at sentencing, a presentation which evidenced his utter failure to accept responsibility for the savagery he inflicted on his infant son. Indeed, we have felt those same emotions in similar circumstances. And while we accept the prosecutor’s representation that her statements at sentencing were not motivated by ill will, the motive of the prosecutor is of no moment because it is the breach and not the intent behind the breach which causes the error. We, therefore, move to the only issue before us: whether the state court unreasonably applied clearly established federal law when it determined that the prosecutor did not breach the plea agreement.[1]
In 1996, Congress enacted the Antiter-rorism and Effective Death Penalty Act (AEDPA), P.L. No. 104-132, 110 Stat. 1214, which “placed a new restriction on *457 the power of federal courts to grant writs of habeas corpus to state prisoners.” Williams v. Taylor, 529 U.S. 862, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Opinion of O’Connor, J.). Because Dunn filed his habeas petition after the effective date of the AEDPA, we are required to apply that statute’s requirements. Predominant among them is the requirement that federal courts give greater deference than before to factual findings and legal determinations of the state courts, with federal habeas corpus relief to be granted only if the state court adjudication
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. §§ 2254(d)(1) and (2).[2]
In Williams, the Supreme Court held that under the “contrary to” prong of 2254(d)(1), the writ may issue if the state court came to a legal conclusion opposite to that reached by the Supreme Court, or if the state court decided a case differently than the Supreme Court has on “materially indistinguishable facts.” Williams, 529 U.S. at 412-413, 120 S.Ct. 1495; see also Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir.2000). The Court also held that under the latter prong of 2254(d)(1), the writ may issue if the state court identified the correct governing legal principle but unreasonably applied that principle. Williams, 529 U.S. at 412-413, 120 S.Ct. 1495. To make such a finding, the habeas court must deter mine “whether the state court’s application of clearly established federal law was objectively unreasonable.” Id. at 409, 120 S.Ct. 1495; see also Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000). As we recognized in Wetis, “the Supreme Court stressed that an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court’s incorrect or erroneous application of clearly established federal law was also unreasonable.” Werts, 228 F.3d at 196. Dunn challenges the state court’s adjudication only under the latter prong of 2254(d)(1)— “unreasonable application” — and our analysis will be restricted to whether the state court unreasonably applied clearly established federal law.
Before we can determine whether there was, in fact, an objectively unreasonable application of clearly established federal law, we must identify the appropriate Supreme Court precedent. Williams, 529 U.S. at 412-413, 120 S.Ct. 1495; see also Werts, 228 F.3d 178 (looking directly to Supreme Court precedent on question of ineffective assistance of counsel claim). The standards controlling adherence to a plea agreement were set forth long ago by the Supreme Court in Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). In Santobello, in exchange for the defendant’s plea of guilty, the prosecutor agreed to make no sentencing recommendation. At sentencing, however, a new prosecutor (apparently ignorant of the first prosecutor’s promise) recommended the maximum one-year sentence. Defense counsel objected to this recommendation and sought an adjournment. The sentencing judge denied that request and stated that he was not at all *458 influenced by the prosecutor’s recommendation. The Court then imposed the maximum one-year, recommended term. On appeal, the conviction was affirmed.
The Supreme Court vacated the judgment and remanded the case. The Court held that a guilty plea “must, of course, be voluntary and knowing and if it was induced by promises, the essence of those promises must in some way be made known.” Id. at 261-262, 92 S.Ct. 495. The Court further held that
[t]his phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.
Id. at 262, 92 S.Ct. 495.[3] The inadvertence of the breach, the Court held, did not “lessen its impact” and, even absent prejudice at sentencing, “the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty will be best served by remanding the case to the state courts for further consideration.” Id. at 262-263, 92 S.Ct. 495.
Thus, in Santobello, the Supreme Court clearly established that a prosecutor may enter into a plea agreement but, after doing so, must fulfill the promises contained therein. If the prosecutor fails to do so, whether purposefully or inadvertently, that breach must be remedied regardless of whether the defendant was prejudiced thereby.[4] Under the limited review we are permitted under the AED-PA, we must decide whether the prosecutor breached the plea agreement and whether the state court’s adjudication to the contrary was an unreasonable application of Santobello. As we have already suggested, we answer each of these questions in the affirmative.
When a criminal defendant claims that the government breached its plea agreement, the first step is to define what the government agreed to do. To appreciate the parameters of the Commonwealth’s agreement, one must first understand the sentencing scheme in Pennsylvania. Unlike the federal sentencing scheme under which a defendant is sentenced to a fixed number of months in prison, in Pennsylvania, a defendant sentenced to confinement must be sentenced to both a minimum and maximum sentence. 42 Pa.C.S.A. § 9756(a) and (b); Stewart v. Pennsylvo- *459 nia Bd. of Probation and Parole, 714 A.2d 502, 505-506 (Pa.Cmwlth.1998) (describing the sentencing scheme as doling out indefinite/indeterminate sentences with a minimum and maximum term); Commonwealth v. Barzyk, 692 A.2d 211, 215 (Pa.Super.1997); Commonwealth v. Cain, 432 Pa.Super. 47, 637 A.2d 656, 659 (1994). To determine the minimum sentence, a court consults Pennsylvania’s sentencing guidelines, which include a matrix to determine a mitigated range, standard range and aggravated range for the minimum sentence. Coss v. Lackawanna County District Atty., 94-CV-1481, 2000 WL 1372871, *5, and n. 6 (M.D.Pa., Aug.23, 2000); Commonwealth v. Adams, 694 A.2d 353, 354 (Pa.Super.1997). The standard range designated in the sentencing guidelines is the standard range for the minimum sentence. 204 Pa.Code § 303.11 and § 303.16 (setting forth ranges of minimum sentences); Commonwealth v. Pittman, 737 A.2d 272, 274 (Pa.Super.1999) (describing the guidelines as setting forth the “legal minimum period of incarceration”); Adams, 694 A.2d at 354 (referring to the guidelines for the minimum sentence); Commonwealth v. Decker, 433 Pa.Super. 402, 640 A.2d 1321, 1323 (1994). The maximum is set by statute and the minimum sentence cannot exceed half of the maximum sentence imposed. 42 Pa.C.S.A. § 9756(b); Cain, 637 A.2d at 659. The parties agree that the standard range for Dunn’s minimum sentence was 36-60 months.
Although the plea agreement in this case was not written, it was distilled many times; indeed, the Commonwealth does not dispute that it agreed to recommend that Dunn’s minimum sentence be in the standard range of minimum sentences, i.e., 36-60 months. Over and over again, that obligation was articulated: “The Commonwealth is recommending a minimum in this case on Count 1 within the standard range, standard guidelines range, but that is not binding on the Court”; “There will be a recommendation of a sentence of a minimum which would be in the standard range;” “The Commonwealth has recommended, but it is not binding on the Court, that on the charge of aggravated assault that the sentence be — that the minimum sentence be in the standard range of sentencing ... ”; “The Commonwealth also indicated that they would recommend a minimum sentence in the standard range, although this was not binding on the Court. In this instance, the range would be 36 to 60 months. So it was the Commonwealth’s recommendation that the minimum sentence be in that range, ...” A462-464, A389. Parenthetically, and contrary to Dunn’s contentions, the Commonwealth did not agree to recommend the minimum sentence of 36 months or a minimum sentence at the lower end of the standard range.
Dunn argues that the prosecutor failed to recommend what she had agreed to recommend but, rather, asked the court to impose a “lengthy” — a “considerable”— sentence. He farther argues that this breach was exacerbated by the remainder of the prosecutor’s comments which made an end-run around her obligation with reference to the promised recommendation. In response, the Commonwealth argues there was no breach because “lengthy” described, albeit not explicitly, the agreed-upon minimum sentence of 36 to 60 months and the prosecutor’s request for such a sentence did not convey to the Court that she sought a longer sentence.
We disagree. Dunn bargained for the recommendation of a minimum sentence within the standard range of mínimums— nothing more, nothing less. As a result, he could reasonably expect that the prosecutor would argue for a minimum sentence as low as three years or as high as five *460 years. What he could not expect was that the prosecutor would seek a minimum sentence beyond five years. This is precisely what the prosecutor did, sliding down a slippery slope on her way to denouncing her legal obligation.
Instead of recommending even a five year minimum term, the prosecutor chose to use the vague, yet loaded, words “lengthy term of incarceration” and “a penalty that’s considerable” — a term of imprisonment she described as necessary to get Dunn’s attention. She did not qualify this request in any respect and did not even mention the words “minimum” or “standard range.” Moreover, a “lengthy term of incarceration” — “a penalty that’s considerable” — could surely have meant something very different from (and, from Dunn’s point of view, much worse than) the promised recommendation of a minimum sentence of between 86 to 60 months, particularly where Dunn was exposed to a sentence of ten to twenty years. Lest there be any doubt, the import of what the prosecutor was seeking was clear when she said:
I can’t ask you to impose the maximum possible penalty. That would go outside of what my initial recommendation was. And I think if I would have a chance to sit down and have a drink of water and calm myself, maybe I would even think that to ask for the absolute maximum is unjust. But I believe this was reckless conduct....
A145. By referring to her obligation under the plea agreement as only her “initial recommendation;” expressing her personal reservations about that agreement and asking for a “lengthy” — a “considerable”— sentence; and stating that if given more time to reflect she might think that the “absolute” maximum would be unjust, thus implying that at that point in time the maximum was just, the prosecutor unequivocally communicated to the Court that she disavowed her earlier recommendation and now believed, as Detective Schwartz had testified, that something up to the maximum sentence allowable by law would be an appropriate sentence. The totality of the prosecutor’s remarks compels the conclusion that her failure to affirmatively recommend a minimum sentence within the standard range had but one purpose: to influence the Court to impose a minimum sentence far greater than five years.
The fact that, at least as of the outset of the sentencing hearing, the Court was aware of what the prosecutor was obliged to recommend does not excuse the Commonwealth’s failure to fulfill that obligation. W e can, of course, imagine sentencings at which articulating a recommended sentence in haec verba would be redundant or, for some other reason, unnecessary and, therefore, not required as long as it can fairly be said that the sentencing court had the recommendation before it when sentence was imposed. Here, however, it appears that what transpired at the sentencing hearing prompted the prosecutor’s impassioned statement, a statement which not only did not articulate or even hint at the promised recommendation, but was inconsistent with that promised recommendation.
Although Santobello did not establish a bright-line test by which to determine when a prosecutor has reneged on a plea agreement, the Court made clear that, at a minimum, when a prosecutor makes a promise which induced, at least in significant part, a guilty plea — or, as here, a plea of nolo contendere — the prosecutor’s promise must be fulfilled. Because no conclusion can be drawn other than that this prosecutor did not, in Santobello’s word, convey even the “essence” of that *461 promise, she breached both the letter and the spirit of her agreement. We conclude that the Superior Court’s determination that the prosecutor did not breach the plea agreement involved, in the words of the AEDPA, “an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).[5]
III.
Having found that the state court unreasonably applied _ Santobello, we must consider what, if any, remedy is appropriate. The Commonwealth, rigid in its position that it did not breach the plea agreement, has not discussed the issue of remedy. For his part, Dunn argues that the harmless error rule does not apply and we are “duty bound” under Santobello to grant him relief regardless of whether the sentencing court was influenced by the Commonwealth’s breach. We agree that San-tobello requires relief, as does this Court’s precedent.
The Supreme Court made quite clear that it did not need to “reach the question of whether the sentencing judge would or would not have been influenced” by the terms of the plea agreement had the agreement not been breached. Santobello, 404 U.S. at 262, 92 S.Ct. 495. Rather, the Court concluded that
the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty will be best served by remanding the case to the state courts for further consideration. The ultimate relief to which petitioner is entitled we leave to the discretion of the state court, which is in a better position to decide whether the circumstances of this case require only that there be specific performance of the agreement on the plea, in which case petitioner should be resentenced by a different judge, or whether, in the view of the state court, the circumstances require granting the relief sought by petitioner, i.e., the opportunity to withdraw his plea of guilty.
Santobello, 404 U.S. at 262-268, 92 S.Ct. 495. Indeed, the Supreme Court’s decision to remand the case despite the sentencing court’s explicit statement that it had not been influenced by the prosecutor’s recommendation leaves little room to argue that the harmless error rule applies.
The rationale for this is evident. By entering into a plea agreement, a defendant voluntarily and knowingly surrenders a plethora of constitutional rights in exchange for a commitment by the prosecutor to do or not do certain things. When the prosecutor breaches that agreement, he or she violates the defendant’s due process rights by implicating the consideration and voluntariness upon which that plea was based. Mabry v. Johnson, 467 U.S. 504, 509, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984)(“It follows that when the prosecution breaches its promise with respect to an executed plea agreement, the defendant pleads guilty on a false premise, and hence his conviction cannot stand: ‘[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.’ ”) (quoting Santobello, 404 U.S. at 262, 92 S.Ct. 495). Especially when the prosecutor’s promise is not binding on the court, the defendant does not bargain for a specific sentence *462 but for a lock on what the prosecutor can do and say at sentencing. That the sentencing court does not follow the prosecutor’s lead is irrelevant. A defendant’s constitutional rights are violated when a prosecutor reneges on the consideration underlying the defendant’s plea of guilty. United States v. Camarillo-Tello, 236 F.3d 1024 (9th Cir.2001).
Breach of a plea agreement by a prosecutor also strikes at public, confidence in the fair administration of justice and, in turn, the integrity of our criminal justice system in which a vast number of cases are resolved by plea agreement. United States v. Van Thournout, 100 F.3d 590, 594 (8th Cir.1996) (noting that this is a concern for federal prosecutions) (citing to United States v. Carter, 454 F.2d 426, 428 (4th Cir.1972)); State of West Virginia v. Palmer, 206 W.Va. 306, 524 S.E.2d 661, 665 (1999) (noting same concern with respect to state prosecutions). Thus, we have held that “the doctrine that the government must adhere to its bargain in the plea agreement is so fundamental that even though the government’s breach is inadvertent and the breach probably did not influence the judge in the sentence imposed, due process and equity require that the sentence be vacated.” United States v. Hayes, 946 F.2d 230, 233 (3d Cir.1991) (internal quotations omitted); see also Williams, 529 U.S. at 375, 120 S.Ct. 1495 (although not all constitutional errors warrant issuance of the writ, “errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ.”); United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir.1998) (breach of plea agreement requires remedy regardless of harmless error rule).
When we find, on review, that a federal prosecutor has breached a plea agreement, we generally leave the remedy to the discretion of the district court. United States v. Badaracco, 954 F.2d 928, 941 (3d Cir.1992) (noting general rule but ordering resentencing because the defendant had already served a considerable portion of his sentence); United States v. Moscahlaidis, 868 F.2d 1357, 1361, 1363 (3d Cir.1989) (regardless of whether the sentencing court was affected by the breach, the general rule requires sentence be vacated and the case remanded for consideration of proper remedy); United States v. Martin, 788 F.2d 184, 187 (3d Cir.1986) (same); see also United States v. Mondragon, 228 F.3d 978, 981 (9th Cir.2000) (holding the “harmless error rule does not apply when the government breaches a plea agreement.”); United States v. Canada, 960 F.2d 263 (1st Cir.1992) (recognizing general rule under San-tobello).
It is equally appropriate when we find that a state prosecutor has breached a plea agreement to refer the issue of remedy to the state court. Thus, this Court will not decide whether Dunn should be resentenced under the plea agreement or given the opportunity to withdraw his plea. Indeed, as the Santobello Court long ago observed, it is best left to the state court to decide what remedy is appropriate. Santobello, 404 U.S. at 263, 92 S.Ct. 495. That this case reaches us under section 2254 also informs our decision to give the state court an opportunity to determine whether Dunn should be resentenced or permitted to go to trial. Coss v. Lackawanna County District Attorney, 204 F.3d 453 (3d Cir.) (en banc) (noting general rule of leaving proper remedy to the state in habeas petition), cert. granted, — U.S. -, 121 S.Ct. 297, 148 L.Ed.2d 238 (2000).[6]
*463 ■ The dissent concludes, based solely on principles of comity and federalism, that the harmless error rule applies to Santo-bello violations; indeed, the dissent seemingly suggests, without pausing to distinguish between constitutional violations which are trial errors and those which are structural defects, that the harmless error rule applies across the board on habeas review. We are not nearly as sure as the dissent that the harmless error rule applies where a prosecutor has broken a promise made in exchange for the agreement to plead guilty and has thereby undercut the basis on which the defendant waived the host of constitutional rights implicit in his or her plea, and we are certainly sure that the harmless error rule does not apply across the board.
The Supreme Court and this Court have, on direct appeal, regularly treated Santobello errors as akin to structural defects not susceptible of harmless error analysis. Santobello, 404 U.S. at 262-263, 92 S.Ct. 495 (remanding even though sentencing court stated it was not influenced by the erroneous recommendation); Nolan-Cooper, 155 F.3d at 236 (citing general rule that remand is necessary once Santo-bello error is found); Badaracco, 954 F.2d at 941 (same); Hayes, 946 F.2d at 233 (same). Nothing in recent Supreme Court caselaw, or in cases decided by this Court, has called this conclusion into question on direct or habeas review; the Commonwealth has not questioned that conclusion here; and the parties have not raised, much less briefed, the issue. Moreover, we do not worry, as the dissent seems to worry, that our conclusion vis-a-vis a San-tobello violation would somehow impact much less set a far-reaching precedent for all guilty pleas, or “wall off over ninety percent of state criminal convictions from harmless-error analysis,” Dissent at 36; indeed, we do not take issue with the dissent’s conclusion that the vast majority of errors alleged in the guilty plea process would be subject to the harmless error rule. In any event, we need not reach the issue, if issue it be, of whether a Santobello violation is a structural or trial error for even if harmless error would apply to a Santobello violation, we would not find the error harmless here where, we note, the prosecutor did much more than simply, as the dissent suggests, call for a “lengthy” sentence.[7]
*464 One final note. We indicated above both our belief that the prosecutor’s comments were incited by Dunn’s refusal to accept responsibility for his actions and our appreciation of the difficulties this sentencing presented. Nonetheless, we reiterate that Santobello does not allow a prosecutor to unilaterally repudiate his or her promises because honoring them becomes distasteful.
IV.
For the reasons stated above, we will reverse the judgment of the District Court denying the petition for a writ of habeas corpus, and remand with instructions that it issue a writ of habeas corpus ordering Dunn’s release if the state court does not remedy the breach within 90 days of our judgment.

. Dunn raises a number of other challenges to his conviction. Because he never requested nor received a certificate of appealability as to those issues, we address only the question of whether habeas relief should issue if the Commonwealth breached its plea agreement. 3d Cir. LAR22.1(b) (“If the district court grants a certificate of appealability as to only some issues, the court of appeals will not consider uncertified issues unless petitioner first seeks, and the court of appeals grants certification of additional issues.”)

. Factual findings of the state courts are presumed correct and it is the petitioner's burden to rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Factual findings are not at issue here.

. This Court has, of course, followed Santo-bello when called upon to review federal convictions. See, e.g., United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir.1998) ("Because the defendant, by entering into the plea, surrenders a number of her constitutional rights, ‘courts are compelled to scrutinize closely the promise made by the government in order to determine whether it has been performed.’ ") (quoting United States v. Hayes, 946 F.2d 230, 233 (3d Cir.1991)); United States v. Moscahlaidis, 868 F.2d 1357, 1361 (3d Cir.1989) (recognizing that Santobello requires a prosecutor to keep his promises).

. In United States v. Benchimol, 471 U.S. 453, 105 S.Ct. 2103, 85 L.Ed.2d 462 (1985) (per curiam), the Court held that, unless agreed to by the prosecutor, an agreement to recommend a particular sentence under Rule 11 of the Federal Rules of Criminal Procedure did not require the prosecutor to make his recommendation "enthusiastically” or explain the reasons for his recommendation. Id. at 455-456, 105 S.Ct. 2103. The allegations here, however, focus not on a less than enthusiastic recommendation or a failure to explain the reasons for the recommendation, but on the fact that the promised recommendation was not forthcoming.

. We note that the Superior Court found that a sentence in the standard range of 36-60 months was "lengthy” and that, in any event, the prosecutor "qualified” her call for a lengthy term by indicating that her initial recommendation was "still intact.” The prosecutor, of course, indicated no such thing.

. Before the state courts, Dunn sought the opportunity to withdraw his plea and proceed *463 to trial. At oral argument before us, however, it was suggested that because he has served more than five years (the most severe minimum sentence under the agreed-upon standard range), we should resentence him to time served. Wholly aside from the legal implications of that suggestion, the circumstances of this case cry out for state court involvement. For example, contrary to Dunn's suggestion, we do not know whether the sentencing court would have imposed a minimum sentence not to exceed five years absent a breach. Nor can we find that Dunn would have been released upon completing whatever minimum term might have been imposed because, under Pennsylvania law, a defendant who completes his or her minimum term is entitled only to be considered for parole. Accordingly, we decline Dunn’s invitation to resentence him to time served, although the state court may certainly deem it appropriate to do so. Moreover, given that Dunn has vacillated on the relief he seeks, remand will give him an opportunity to make an informed, counseled request.

. The dissent speculates that the reason Dunn did not pursue a direct appeal was because, if he were to have prevailed on appeal such that his plea was vacated, he could have been exposed to less favorable plea terms or even potential homicide charges. From this, the dissent concludes that we are "rewarding” Dunn's "tactical use of federal habeas relief.” Dissent at 33. But as the various opinions in Santobello underscore, Dunn could have sought specific performance of the agreement instead of vacation of his plea with his preference, as Justice Douglas put it, accorded "considerable, if not controlling, weight." Santobello, 404 U.S. at 267, 92 S.Ct. 495. We *464 see no "tactical” advantage here from having waited; indeed, given the result we r each, there may well have been a disadvantage.