UNITED STATES of America

v.

William RUBENSTEIN, Defendant.

No. 03–CR–00723 (JFB)

United States District Court,
E.D. New York.

January 9, 2017

The United States is represented by Robert L. Capers, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, 5th Fl., Central Islip, New York 11722 by Vincent Lipari, Assistant U.S. Attorney.

Defendant William Rubenstein is represented by Alan L. Zeg as, 552 Main Street, Chatham, New Jersey 07928.

### MEMORANDUM AND ORDER

Joseph F. Bianco, District Judge:

In February 2009, defendant William Rubenstein ("defendant" or "Rubenstein") entered into a plea agreement (ECF No. 597 Ex. A (the "Agreement")) with the Tax Division of the United States Department of Justice (the "Tax Division") and the Environmental Crimes Section of the Environment and Natural Resources Division of the United States Department of Justice (the "Environmental Crimes Section," together, the "government"). (Rubenstein Cert. ¶ 11; Lipari Dec. Ex. A.) Under the terms of the Agreement, Rubenstein pled guilty to conspiracy to defraud the Internal Revenue Services (the "IRS") by defeating the assessment and collection of nearly $1.9 million in federal excise taxes for the period from July 1995 to February 2000. (Lupari Dec. Ex. A ¶ 10.) He agreed to cooperate fully with the government in its prosecution of his co-defendant, Dov Shellef, to pay a fine of $10,000, and to make restitution in the amount of $940,230.50, which represented half of the excise tax that had been avoided as a result of the conspiracy. (Rubenstein Cert. ¶ 12.) In August 2011, this Court sentenced Rubenstein to time-served and the payment of the restitution and fine as set forth in the Agreement. (Rubenstein Cert. ¶ 13.) Rubenstein made the restitution payment in full on the same day. (*Id.* ¶ 14.)

In September 2015, the IRS sent Rubenstein four notices for unpaid restitution for the years 1997 through 2000, a portion of the period during which the conspiracy to which Rubenstein pled guilty took place. (Rubenstein Cert. ¶¶ 17–20; Gov't Br. 5.) The total amount of the IRS's assessment was $2,120,348.86. (Lupari Dec. Exs. C, D, E, F.)

Since that time, Rubenstein has contested the IRS's assertion that he owes this amount. On March 15, 2016, Rubenstein filed the instant Order to Show Cause, by which he seeks injunction relief to stay the collection of any taxes by the IRS on the basis that the IRS's attempt to collect this restitution amount under the Firearm Excise Tax Improvement Act of 2010 (the "Act") violates the Ex Post Facto and Double Jeopardy Clauses of the United States Constitution. Rubenstein further requests a declaration from the Court that his resti-

tution obligations to the IRS were satisfied in full on the day of the sentencing because the Agreement entered by Rubenstein, the Tax Division, and the Environmental Crimes Section extinguishes any further monetary liability on the part of Rubenstein with respect to the United States government. In other words, Rubenstein asserts that because the Tax Division and the Environmental Crimes Section signed the Agreement, all other U.S. agencies are prohibited from pursuing any other actions—whether civil or criminal—against Rubenstein relating to the conduct underlying his Agreement.

For the reasons stated herein, the Court disagrees and denies Rubenstein's motion in its entirety.

## I. BACKGROUND

The following facts are taken from the parties' submissions. Unless otherwise noted, the facts are undisputed by the parties.

### A. THE CRIMINAL CASE: VERDICT TO REMAND

On July 28, 2005, Rubenstein and Shellef were found guilty by a jury of conspiracy to defraud the IRS and wire fraud. (ECF No. 137.)[1] The conduct underlying the offense involved Rubenstein and Shellef's purchase of CF–113, commonly known as freon, a hazardous chemical subject to extensive regulations in the United States. (Rubenstein's Br. Supp. Order Show Cause ("Def. Br."), ECF No. 591–1 at 1.) When freon is sold domestically, manufacturers must pay an excise tax. (Id.) When freon is exported, manufacturers are not required pay an excise tax. (Id.) In contravention of law, Rubenstein and Shellef represented to two different manufacturers from which they purchased freon that they were going to export it, thereby avoiding the excise tax, subsequently sold a portion

of it domestically, and did not inform the manufacturers of the domestic sales. (Id. at 1–2.) This caused the manufacturers to not pay the excise taxes. (Id.)

On March 2006, Rubenstein was sentenced to a term of 18 months in prison and the payment of $1,880,461 in restitution (which represented the excise tax that had been avoided as a result of the conspiracy), $4,400 in assessments, and a $10,000 fine. (Rubenstein Cert. ¶ 7.) The following month, the Court granted Rubenstein's application for an installment plan to pay the nearly $1.9 million in restitution before he reported to prison in August of that year. (Rubenstein Cert. ¶ 8.) Rubenstein completed the restitution payments in full less than three months later. (Rubenstein Cert. ¶ 9.)

In November 2007, the Second Circuit reversed Rubenstein's conviction because the indictment had improperly joined Shellef and Rubenstein as defendants. *United States v. Shellef,* 507 F.3d 82, 82 (2d Cir. 2007). The case was remanded for a new trial. (Id.) In April 2008, the district court ordered the return of the nearly $1.9 million in restitution, the $4,400 assessment, and the $10,000 fine to Rubenstein. (Rubenstein Cert. ¶ 10.) In June 2008, the IRS returned the money. (Id.)

### B. THE PLEA AGREEMENT

In February 2009, Rubenstein entered the Agreement with the Tax Division and the Environmental Crimes Section. (Rubenstein Cert. ¶ 11; Lipari Dec. Ex. A.) Later that month, the Honorable Thomas C. Platt accepted the plea. (ECF No. 514.) As noted above, under the terms of the plea, Rubenstein pled guilty to conspiracy to defraud the IRS by defeating the assessment and collection of federal excise

---

1. Shellef was also convicted of additional counts, including tax evasion and money laundering. (ECF No. 137.)

taxes of nearly $1.9 million for the period from July 1995 to February 2000 (Lupari Dec. Ex. A ¶ 10). He agreed to cooperate fully with the government in its prosecution of Shellef, to pay a fine of $10,000, and to make restitution in the amount of $940,230.50, which represented half of the excise tax that had been avoided as a result of the conspiracy. (Rubenstein Cert. ¶ 12.) Although the Agreement called for half the excise tax, the proof at the trial that concluded in June 2003 demonstrated that Rubenstein's share of the total excise tax that had been avoided was only eight percent. (Rubenstein Cert. ¶ 12.)

In relevant part, the Agreement further provided that (1) the government agreed not to bring any "further criminal charges" against Rubenstein for his role in the conspiracy and (2) the Agreement

> incorporate[d] the complete understanding between the parties, and no other promises have been made by the Government to the defendant .... This Agreement does not prevent any governmental agency from pursuing civil or administrative actions against defendant or any property.
>
> Unless an exception to this paragraph is explicitly set forth elsewhere in this document, this Agreement does not bind or obligate governmental agencies other than the Environmental Crimes Section and the Tax Division of the United States Department of Justice ....

(Lupari Dec. Ex. A ¶¶ 12–13.)

In August 2011, Rubenstein was sentenced by this Court to time-served and the payment of the fine and restitution as called for in the Agreement. (Rubenstein Cert. ¶ 13.) As noted above, Rubenstein made the restitution payment in full on the same day. (Rubenstein Cert. ¶ 14.)

The restitution payment called for in the Agreement allowed for interest only in the event that restitution was not paid in full before the fifteenth day after the date of the judgment. (Rubenstein ¶ 15.) As such, because Rubenstein paid his restitution obligation in full on the day of sentencing, he owed no interest under the Agreement. (*Id.*)[2]

### C. THE IRS'S COLLECTION EFFORTS

Pursuant to the IRS's powers under Title 26 (the "Code" or "Title 26"), the IRS assessed approximately $1 million in interest on the $940,230.50 restitution Rubenstein paid under the Agreement and judgment. (Gov't Br. 1; *see* 26 U.S.C. §§ 6201(a)(4), 6601.) Beginning in September 2015, the IRS began collection efforts to collect this interest. (Rubenstein Cert. ¶¶ 17–20; Gov't Br. 5.)[3]

By undated letter sent to the IRS on September 16, 2015 (Lupari Dec. Ex. G), Rubenstein contested the notices and contended that he had satisfied in full all of his federal excise tax obligations (Gov't Br. 5). On September 17, 2015, Rubenstein called the IRS and explained that he had fully satisfied his restitution obligations at the time he was sentenced (*i.e.*, four years earlier). (Rubenstein Cert. ¶ 21.) The employee with whom he spoke advised him that she had removed the matter from IRS collection and had transferred it to the administrative section of the IRS for further review. (*Id.*) She told Rubenstein that no activity would be undertaken while it was under review. (*Id.*)

---

**2.** The government agrees with this statement insofar as the Agreement only applied to Rubenstein's obligation to pay interest pursuant to Title 18 under the criminal judgment. (Gov't Br. 4–5.)

**3.** The IRS's initial assessment was approximately $2.1 million. The IRS subsequently offset this amount with Rubenstein's restitution payment made at the time he was sentenced. (*See* Lupari Dec. Exs. C, D, E, F.)

In January 2016, L. Yow of the IRS contacted Rubenstein by letter and informed him that he was liable for more than $1 million in restitution. (Rubenstein Cert. ¶ 22; Lipari Dec. Ex. H.) Both parties describe certain aspects of the letter. Defendant focuses on the letter's statement that Rubenstein was responsible for interest that accrued on the restitution payment he made at his sentencing because three months lapsed between the date of the sentencing and the date on which the Court remitted the funds to the IRS. (Rubenstein Cert. ¶ 22.) The government, on the other hand, focuses on the fact that the letter advised Rubenstein that it was in the process of crediting the restitution payment, but interest on the restitution amount would continue to accrue under the Code from the date the underlying excise taxes were due (*i.e.*, December 31, 1997, 1998, 1999, and 2000) to the date the amounts were paid in full. (Lipari Dec. Ex. H.) The government also highlights the portion of the letter in which the IRS distinguished between the interest owed upon the restitution amount under the judgment of conviction from the interest due under the Code, which states that "[e]ven if the court waives interest under Title 18 ... you [Rubenstein] continue to accrue interest under Title 26 .... The Court cannot waive interest under Title 26." (*Id.*) The letter contained all the foregoing statements.

In response to that letter, Rubenstein's attorneys spoke with Ms. Yow by telephone. (Rubenstein Cert. ¶ 23.) Ms. Yow responded that she had been unaware of certain aspects of the chronology Rubenstein's payments, that she would need approximately four weeks to recalculate the amount owed, and that a 90–day stay of collection would be placed on Rubenstein's account. (*Id.*)

Later that month, on January 24, 2016, Rubenstein found the business card of IRS Revenue Officer James Nelson on the door of the residents' entry to the condominium complex where he resides. (Rubenstein Cert. ¶ 24.) It was accompanied by a notice stating that it was important that Rubenstein contact Nelson. (*Id.*) He attempted to contact Nelson repeatedly, and on January 27, 2016, Nelson and Rubenstein spoke. (*Id.* ¶ 25.) Rubenstein explained that he had been assured in his September 2015 and January 2016 communications with the IRS that no collection efforts would be commenced against him while the administrative section of the IRS was reviewing its files. (*Id.*) Rubenstein provided Nelson with Ms. Yow's telephone number. (*Id.*) Nelson said that, although he understood Rubenstein's request, he had received different directions from his supervisor. (*Id.*)

After this conversation, Rubenstein received a letter from Nelson dated January 25, 2016. (Rubenstein Cert. ¶ 26.) The letter stated Nelson would be contacting other persons about Rubenstein's debt to the IRS to obtain or verify information. (*Id.*) In response, Rubenstein's tax attorney contacted Nelson, advised him that he would be contacting Nelson's supervisor, and requested Nelson to refrain from further collection activity until he was able to do so. (Rubenstein Cert. ¶ 27.) Nelson agreed to suspend collection activity. (*Id.*) Rubenstein's tax attorney repeatedly and unsuccessfully attempted to contact Nelson's supervisor. (*Id.* ¶ 28.) To date, Nelson's supervisor has not responded to these attempts. (*Id.*)

On March 7, 2016, Rubenstein completed IRS Form 911 to request IRS Taxpayer Advocate Service in response to Nelson stating he would continue collection activity against Rubenstein, including by filing a public lien against his property. (Rubenstein Cert. ¶ 29.) Four days later, Rubenstein received a Final Notice that stated the IRS intended to impose a tax lien.

(Rubenstein Cert. ¶ 30.; Lipari Dec. Ex. I.) On March 15, 2016, Rubenstein filed the instant Order to Show Cause, by which he seeks injunctive relief to stay the collection of any taxes and a declaration from the Court that he has satisfied his restitution obligations to the IRS in full.

By letters dated March 21 and April 7, 2016 (Lipari Dec. Ex. J and Ex. K, respectively), Rubenstein requested an IRS Appeals hearing and asked that the IRS be enjoined from filing a lien and commencing collection activities until Rubenstein exhausted administrative and legal remedies. The IRS agreed to stay collection efforts pending the determination of Rubenstein's instant application.

## II. APPLICABLE LAW

### A. THE PROSECUTION OF CODE VIOLATIONS AND 26 U.S.C. §§ 6201(a)(4); 6601

 In general, prosecutions for offenses under the Code are carried out by either the Tax Division or an office of a United States Attorney. Internal Rev. Svcs. Man. ¶ 9.5.12.4.1 (July 25, 2007). In the event a defendant to a criminal suit is either found guilty or pleads guilty, restitution may be ordered by the sentencing court. 18 U.S.C. § 3556. Any restitution ordered in criminal tax cases under the Code is owed to the IRS. *See United States v. Helmsley*, 941 F.2d 71, 101 (2d Cir. 1991). Separately, the "government may pursue a tax evader for unpaid taxes, penalties and interest in a civil proceeding ... [and] any amount paid as restitution for taxes owed must be deducted from any judgment entered for unpaid taxes in such a civil proceeding." *Helmsley*, 941 F.2d at 102.[4]

The Firearm Excise Tax Improvement Act of 2010 created an exception from the general restrictions placed on the IRS's collection and assessment of taxes determined to be owed through a guilty verdict or plea. This included (1) requiring the IRS to assess and collect restitution amounts as if such amounts were a tax, § 6201(a)(4)(A); (2) requiring the IRS to wait to assess restitution in this manner until all appeals of the restitution order are concluded and the right to make all such appeals has expired, § 6201(a)(4)(B); (3) prohibiting defendants from challenging the amount of the restitution, § 6201(a)(4)(C); and (4) enabling the IRS to make such assessments without certain restrictions placed on collection generally, § 6213(b)(5); *see also* § 6501(c)(11).

However, well before the Act, the IRS had authority to make assessments of all taxes imposed under the Code, including unpaid excise taxes and interest that accrues on them. *See* 26 U.S.C. § 6201(a) ("The Secretary is authorized and required to make ... assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title ... which have not been duly paid ...."); 26 U.S.C. § 6601 ("If any amount of tax imposed by this title ... is not paid on or before the last date prescribed for payment, interest on such amount ... shall be paid ...."); *see also Helmsley*, 941 F.2d at 102 ("[The] government may pursue a tax evader for unpaid taxes, penalties and interest in a civil proceeding ... [and] any amount paid as restitution for taxes owed must be deducted from any judgment entered for unpaid taxes in such a civil proceeding."). Therefore, as the government correctly argues, the Act did not create or extend liability for defendants found guilty of evading taxes. Instead, it changed the pro-

---

4. Section 6601 of the Code provides that interest on any amount of tax imposed by the Code that is not paid when due shall be paid for the period from the due date until the date it is paid. 26 U.S.C. § 6601(a). The rate of interest applicable to tax underpayments is set forth in 26 U.S.C. § 6621(a)(2).

cess under which already existing liability could be enforced.

### B. THE EX POST FACTO AND DOUBLE JEOPARDY CLAUSES

■ Among the protections afforded by the Constitution is the prohibition against ex post facto laws. *See* U.S. Const. art. I, § 9. Under this provision, laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts" are prohibited. *Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). It prohibits any law that (1) "punishes as a crime an act previously committed, which was innocent when done," (2) "makes more burdensome the punishment for a crime, after its commission," or (3) "deprives one charged with crime of any defense available according to law at the time when the act was committed." *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925).

■ The Double Jeopardy Clause protects an individual's right not to be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. It prohibits both the second prosecution of a defendant for the same offense after an acquittal or a conviction and the imposition of multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

■ As the Supreme Court has explained, the prohibition against ex post facto laws and double jeopardy "applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); *see Doe v. Pataki*, 120 F.3d 1263, 1272 (2d Cir. 1997) (" 'Ex post facto' is a term of art applicable only to 'punishment' . . . .").

To determine whether a challenged sanction is civil in nature, courts must analyze two issues. *United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (establishing the two-prong inquiry in the context of the Double Jeopardy Clause); *United States v. Certain Funds Contained in Account Nos. 600–306211–006, 600–306211–011, and 600–306211–014 Located at the Hong Kong and Shanghai Banking Corp.*, 96 F.3d 20, 26 (2d Cir. 1996) (extending the two-prong inquiry to the Ex Post Facto Clause). First, the court should determine "the intent underlying the enactment of, or the end served by" the law. *Doe*, 120 F.3d at 1273. "[I]f a disability is imposed 'not to punish, but to accomplish some other legitimate governmental purpose,' then it has been considered 'nonpenal.' " *Id.* (quoting *Trop v. Dulles*, 356 U.S. 86, 96, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

■ If the law was designed to be punitive in nature, the protections of the Ex Post Facto and Double Jeopardy clauses apply. If the law was not designed to be punitive in nature, courts must then determine whether, despite this, it is "so punitive either in purpose or effect" that it is "transform[ed] into a criminal penalty . . . ." *United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). "The Supreme Court has not spelled out the precise nature of the second-stage inquiry," *Doe*, 120 F.3d at 1275, and indeed has determined it to be "a highly context specific matter," *Flemming v. Nestor*, 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). However, the Court has set forth a list of considerations to guide the inquiry. These include

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its

operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . .

*Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (footnotes omitted). The list is not exhaustive nor is any particular inquiry dispositive. *United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980); *see Doe*, 120 F.3d at 1275 ("Sometimes one factor will be considered nearly dispositive of punitiveness 'in fact,' while sometimes another factor will be crucial to a finding of nonpunitiveness.") (citation omitted).

▮ The burden rests on the party challenging the law to "show by 'the clearest proof' that the sanctions imposed 'are so punitive in form and effect as to render them criminal despite Congress' intent to the contrary.'" *Doe*, 120 F.3d at 1274 (quoting *Ursery*, 518 U.S. at 290, 116 S.Ct. 2135). The Supreme Court has described this burden as "heavy" and found punishments such as involuntary civil confinement in *Hendricks* to be civil in nature. *See Kansas v. Hendricks*, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). At the same time, the Court has recognized that sanctions imposed in civil proceedings may constitute punishment. *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); *Hudson v. United States*, 522 U.S. 93, 95, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).

In *Department of Revenue of Montana*, the Supreme Court specifically analyzed whether a tax provision was punitive in nature. There, the State of Montana imposed a tax on marijuana once a taxpayer was criminally convicted of owning the marijuana that was taxed. *Department of Revenue of Montana*, 511 U.S. at 767, 114 S.Ct. 1937. First, the Court implicitly found that, as a tax, the first step of the inquiry as to whether the statute was intended to be civil or penal was resolved in favor of finding it civil. *See Department of Revenue of Montana*, 511 U.S. at 779–80, 114 S.Ct. 1937. Noting the differences between taxes and fines, penalties, and forfeitures, the Court noted that "taxes are typically different because they are usually motivated by revenue-raising, rather than punitive, purposes." *Department of Revenue of Montana*, 511 U.S. at 779–80, 114 S.Ct. 1937. However, "a tax is not immune from double jeopardy scrutiny simply because it is a tax" and, "at some point, an exaction labeled as a tax approaches punishment . . . ." *Id.* at 779, 114 S.Ct. 1937.

The Court held that the tax at issue in *Department of Revenue of Montana* was punitive in nature. It determined that it was different from a standard tax assessment designed to gather revenue in crucial respects. *Id.* at 783, 114 S.Ct. 1937. In particular, the Court concluded that the rate of taxation was remarkably high, *id.* at 780–81, 114 S.Ct. 1937; the tax served a deterrent purpose, *id.*; the tax was "conditioned on the commission of a crime," *id.* at 781, 114 S.Ct. 1937; and that the entire class of taxpayers subject to the tax were those who have been arrested for the crime on which the tax is conditioned, *id.*

C. Review and Enforcement of Plea Agreements

▮ As a threshold matter, both defendants and the government are bound to the terms of plea agreements, and neither party to a plea agreement may "unilaterally rewrite the agreement to protect its interests." *United States v. Alexander*, 869 F.2d 91, 93 (2d Cir. 1989). Plea agreements are to be construed "strictly against the

government." *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2005). In line with this, the Second Circuit has instructed that courts should not "hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness." *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999). "To determine whether a plea agreement has been breached, a court must look to what the parties reasonably understood to be the terms of the agreement." *Id.* at 636 (citation omitted).

▬▬▬ When one of the parties to a plea agreement breaches its terms, a district court may order specific performance of the agreement. *Id.* at 94 ("[W]hen a defendant breaches his plea agreement, specific performance is available to the government as a possible remedy."); *United States v. Brody*, 808 F.2d 944, 947 (2d Cir. 1986) ("The remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement."). However, "not every breach [by the government] requires a remedy." *United States v. Vaval*, 154. Whether a remedy is warranted "depends on the 'nature of the broken promise and the facts of each particular case.'" *Id.* (quoting *Brody*, 808 F.2d at 948).

### III. Analysis

Based on the following, the Court denies Rubenstein's order to show cause.

A. The Ex Post Facto and Double Jeopardy Clauses Do Not Apply to the IRS's Assessment of Interest and Collection Efforts.

▬▬▬ Rubenstein's ex post facto argument is that Section 6201(a)(4) is a legislative action that "makes more burdensome the punishment for a crime, after its commission," *Beazell*, 269 U.S. at 169, 46 S.Ct. 68—the second *Beazell* category. (Def. Br. 10–13.) He asserts that because

the IRS is using the Act, which was not in existence at the time of defendant's plea, to seek more than $1 million in additional tax and interest for the calendar years 1997 through 2000, "[t]he IRS is seeking to retroactively penalize defendant ...." (Def. Br. 11.) In addition, Rubenstein specifically argues that 26 U.S.C. § 6501(11)(c) of the Act, which provides that "[i]n the case of any amount described in section 6201(a)(4), such amount may be assessed, or a proceeding in court for the collection of such amount may be begun without assessment, at any time," violates the Ex Post Facto Clause. (Def. Br. 12.) Similarly, Rubenstein argues that Section 6201(a)(4) violates the Double Jeopardy Clause because it constitutes a second punishment for the same offense (tax evasion). The Court concludes that, because Section 6201(a)(4) is civil and not penal in nature, the Ex Post Facto and Double Jeopardy Clauses do not apply. Therefore, the IRS's collection efforts pursuant to it do not violate either clause.

The government argues that Rubenstein's claims are without merit because it is well settled that "[t]he ex post facto bar ... is applicable only to criminal punishments, and does not include retrospective laws of a different character," (Gov't Br. 11 (quoting *Hobbs v. County of Westchester*, 397 F.3d 133, 157 (2d Cir. 2005)), and the IRS's assessment of interest under §§ 6201(a)(4) and 6601 is civil (Gov't Br. 12.)

In contrast, Rubenstein provides several arguments as to why the IRS's collection efforts should be deemed penal rather than civil. First, Rubenstein states that § 6201(a)(4) is criminal because it applies specifically to orders of criminal restitution, the heading under which it is set forth. (Def. Rep. Br. 6.) Rubenstein likewise states that statutory history makes clear that the section is criminal because

Congress "intended to provide the IRS with a tool to collect criminal restitution . . . ." (*Id.* at 6–7.) However, the fact that § 6201(a)(4) pertains to criminal orders does not render it criminal itself. Moreover, as discussed in detail below, the Court finds Rubenstein's arguments to be unpersuasive.

In discussing the punitive nature of the IRS's assessment, Rubenstein alludes to the fact that the interest being sought by the government is more than twice the amount than that provided for in his Agreement. (Def. Br. 8.) First, that description is based on the IRS's assessment *before* it was offset by the amount paid by Rubenstein at the time of his sentencing; the updated amount the IRS has assessed is approximately $1 million. Although this is still a significant amount (especially given the restitution amount itself was approximately the same), this does not transform § 6601(a)(4) into a penal provision because § 6601(a)(4) itself does not proscribe the calculation of interest. Instead, 26 U.S.C. § 6601(a) calls for the collection of interest on underpaid taxes and the calculation of interest is set forth under 26 U.S.C. § 6621. Both of these provisions were in effect at the time Rubenstein entered the Agreement, as was 6201(a), which authorizes and requires the IRS to make assessments of all taxes, including interest, imposed by the Code that were not paid as required by law. In light of this, the IRS had the complete ability to collect the amount they are seeking before § 6201(a)(4) was passed.

The Court, therefore, disagrees with Rubenstein's characterization of § 6201(a)(4) as penal. First, as a tax assessment tool, § 6201(a)(4) was intended to be civil in nature. *See Department of Revenue of Montana,* 511 U.S. at 779, 114 S.Ct. 1937; *see also* 26 U.S.C. § 6201(a)(4) ("The Secretary shall assess and collect the amount of restitution . . . for failure to pay any tax imposed under this title *in the same manner as if such amount were such tax.*" (emphasis added)). Moving beyond its "label," *id.* the provision is not "so punitive either in purpose or effect" that it is "transform[ed] into a criminal penalty . . . ." *United States v. Ward,* 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). As the Government explained in its brief, § 6601(a)(4) provides the IRS with another means to collect tax liability it otherwise was owed and able to collect pursuant to various other provisions in the Code, including 26 U.S.C. §§ 6621 and 6201(a). Simply put, it provided another means to pursue something decidedly civil in nature. Further, taking into account the factors set forth by the Supreme Court in *Kennedy*, the IRS's related collection efforts of interest (1) do not involve an affirmative disability or restraint, (2) have not historically been regarded as a punishment, (3) are generally intended to raise revenue, (4) the alternative purpose of tax collecting, or "revenue raising," may be rationally connected to it, and, (5) as a collection of the interest that was owed to the IRS, it does not appear excessive in relation to the alternative purpose assigned (tax collection). *Kennedy,* 372 U.S. at 168–69, 83 S.Ct. 554.

Consideration of the factors set forth in *Department of Revenue of Montana* further supports this conclusion. As a general matter, the IRS's assessment and attempt to collect interest in this case follows uniform Code provisions that are clearly designed to raise revenue. *See Department of Revenue of Montana,* 511 U.S. at 779–80, 114 S.Ct. 1937. The "rate of taxation" here is not remarkably high; again, it *is* the standard interest rate applicable to all taxes that are not paid as required by statute. *See id.* at 780–81, 114 S.Ct. 1937; 26 U.S.C. § 6601(a). Further, as one method of assessment among many in the Code and because it imposes only the tax that

was owed to the IRS initially, § 6201(a)(4) cannot be said to serve a deterrent effect that would render it a criminal punishment. The best demonstration of this is that, unlike the tax imposed in *Department of Revenue of Montana*, the interest the IRS is seeking to collect in the present case is not only imposed on those who have engaged in (and been convicted of) criminal activity. Instead, the excise tax generally is imposed on all manufacturers selling freon domestically, and the § 6201(a)(4) mechanism specifically can only be used to collect taxes, such as the excise tax, that were due to the IRS under non-criminal provisions. The conclusion that § 6201(a)(4) is not designed to punish or deter criminal conduct is underscored by the fact that the IRS offset the original amount due to it by the amount Rubenstein paid at sentencing. This also undercuts Rubenstein's entire argument that the IRS is using § 6201(a)(4) to punish Rubenstein for a second time. As the government stated, to conclude that § 6201(a)(4) and the related statutory provisions were punitive in nature when applied to those who had been ordered to pay restitution on owed taxes pursuant to being convicted of tax fraud would actually render those individuals in a better position civilly than those who had not been.

In light of this, Rubenstein has failed to meet his "heavy burden" to show "by the clearest proof" that the IRS's assessment pursuant to the Act is "so punitive in form and effect as to render [it] criminal despite Congress' intent to the contrary." *See Doe*, 120 F.3d at 1274. Thus, the Double Jeopardy and Ex Post Facto clauses do not apply, and Rubenstein's effort to stop the collection of interest on these grounds is denied.[5]

**B. THE PLEA AGREEMENT DOES NOT PREVENT THE IRS FROM ASSESSING AND COLLECTING INTEREST ON RUBENSTEIN'S RESTITUTION PAYMENT.**

Rubenstein argues that the Agreement constitutes the entirety of the agreement between him and the government and, therefore, his payment of restitution in accordance with the Agreement satisfies any restitution obligation he may have to any arm of the federal government. (Def. Br. 20–24.) In support of this argument, Rubenstein references the fact that "[t]he IRS participated in the investigation, prosecution, and determination of restitution during the plea negotiations." (*Id.* at 22.) Further, defendant argues, the Tax Division was a party to the Agreement. (*Id.*) Rubenstein states that, because he complied with the terms of the agreement (namely, by paying the restitution it called for and by complying with his obligation to cooperate in the prosecution of Shellef), this Court should order the government to comply with it as well. (*Id.* at 22–23.)

The government asserts that the IRS's assessment and collection efforts are not at odds with the terms of the Agreement. Specifically, it claims that the restitution and interest ordered by the Agreement was the amount that Title 18 authorizes sentencing courts to impose and was not the interest on a tax liability, which the IRS may assess under the Code. (Gov't Br. 7–8.) *See also United States v. Rabkin*, 315 F.R.D. 159, 164 (E.D.N.Y. 2016) (determining in an analogous situation that the

---

5. Rubenstein's arguments involving the time notice of the Act's amendment was circulated and the IRS's statements that the Act was not designed to be applied retroactively are irrelevant to the determination ·as to whether the Act is civil or penal in nature and, thus, the

Court does not consider them here. In any event, the latter argument is a mischaracterization of the application of the Act, which on its face calls for application to all defendants *sentenced* after its enactment. *See* 26 U.S.C. § 6201(c)(11).

IRS's assessment and collection efforts were not prohibited by a plea agreement that only called for restitution pursuant to Title 18). Because the Agreement is silent as to whether the IRS would be able to make a separate civil assessment under the Code, the government asserts that it does not prohibit it from doing so. (*Id.* at 8.)

The government points to several provisions of the Agreement that support this conclusion. Relevant to the Court's determination, the Agreement provided that the government agreed that "no further *criminal* charges will be brought against the defendant for his role in the conspiracy to defraud the United States of excise taxes . . . ." (Agreement ¶ 12(a) (emphasis added).) The agreement also states that it "does not prevent *any* governmental agency from pursuing *civil or administrative* actions against defendant or any property." (*Id.* ¶ 13 (emphasis added).) The paragraph goes on to state that, "[u]nless an exception to this paragraph is explicitly set forth elsewhere in this document, this Agreement does not bind or obligate governmental agencies other than the Environmental Crimes Section and the Tax Division of the United States Department of Justice." (*Id.*) No such exception exists in the Agreement.

Keeping in mind that plea agreements are to be construed "strictly against the government," the Court concludes that the plain text of the agreement supports the government's position and that the parties "reasonably understood" the agreement to permit civil and administrative actions, such as the IRS's assessment and collection efforts. *See Vaval*, 404 F.3d at 152; *Lawlor*, 168 F.3d at 636. The Agreement could not be clearer that it only prevents future "criminal charges" and does not restrict "any" governmental agency from pursuing "civil or administrative actions against defendant." (Agreement ¶¶ 12–13.)

Moreover, it explicitly states that the only agencies that it binds are the Environmental Crimes Section and the Tax Division. Of course, the IRS is an agency wholly distinct from the Environmental Crimes Section and Tax Division, notwithstanding the fact that the Tax Division may criminally prosecute violations of the Code.

Rubenstein argues the Firearm Excise Tax Improvement Act was not in existence until after he entered the plea and, therefore, he was not able to negotiate whether the IRS's assessment and collection efforts pursuant to it would be permitted by the agreement. (Def. Reply 2–3.) However, as explained above, the IRS *did* have the power to collect the entire amount of Rubenstein's owed taxes and the interest that accrued on them pursuant to 26 U.S.C. §§ 6201(a) and 6601. Because the IRS had that power, Rubenstein was in a position to consider whether he should sign the Agreement even though it included the provision that it did "not prevent any governmental agency from pursuing civil or administrative actions against defendant or any property" (Agreement ¶ 13), *i.e.*, it enabled the IRS to do exactly what it is doing now. The IRS is simply using a new mechanism to accomplish the same ends that were permitted under the Agreement when Rubenstein negotiated it, when Rubenstein signed it, and when the Agreement was entered in court. Further, although defendant asserts he understood that he was relieved of any further financial obligation to the government arising from the conduct at issue in his plea (Def. Rep. Br. 3), this understanding is untenable in the face of the plain language of the Agreement itself.

Rubenstein cites *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) for the proposition that the IRS should be bound by the Agreement and prohibited from seeking interest

on the restitution ordered, despite the Agreement's explicit reference to the fact that it does not bind any governmental agency from pursuing civil or administrative actions against Rubenstein. In *Santobello*, an assistant district attorney agreed to make no recommendation in the course of negotiating a plea agreement. *Id.* at 258, 92 S.Ct. 495. At sentencing, another prosecutor had replaced the prosecutor who had negotiated the plea, and the new prosecutor—"apparently ignorant of his colleague's commitment"—made a sentence recommendation. *Id.* at 259, 92 S.Ct. 495. Deciding a breach of the agreement had occurred, the Supreme Court remanded the case for the sentencing court to decide whether to order specific performance of the plea agreement or to give petitioner the opportunity to withdraw his plea. *Id.* at 263, 92 S.Ct. 495. It found that the "staff lawyers in a prosecutor's office have the burden of letting the left hand know what the right hand is doing or has done" and that the breach of the agreement was, therefore, not excused. *Id.* at 262, 92 S.Ct. 495. *Santobello* is inapposite because, first, there was a breach of the agreement in *Santobello*, whereas there was no such breach of the Agreement here. Moreover, to the extent that Rubenstein relies on *Santobello* to assert that the Tax Division and Environmental Crimes Section should have "let[ ] the left hand know what the right hand is doing," *Santobello* is clearly distinguishable because, in the present case, the IRS is a completely distinct agency, and, as such, was not bound to the Agreement and was not barred from instituting civil or administrative proceedings against Rubenstein. By contrast, in *Santobello*, the same district attorney's office— *i.e.*, the prosecution in the criminal case— had acted inconsistently with respect to the plea agreement and in a way that violated the terms of the agreement. As such, Rubenstein's argument in reliance on *Santobello* is unpersuasive.

In light of the foregoing, the Court concludes that the Agreement explicitly permits civil and administrative proceedings, which encompasses the IRS's assessment and collection efforts in the present case. As such, the IRS's assessment and collection efforts are not prohibited by the Agreement, and neither the IRS (which is not a party to the agreement), nor any arm of the federal government, is in violation of the Agreement. Therefore, the Court concludes there has not been a breach of the Agreement and, thus, no remedy, including the specific performance Rubenstein requests, is warranted. As such, the Court declines to exercise its power under Rule 38(e) of the Federal Rules of Criminal Procedure to stay the restitution ordered at Rubenstein's sentencing and finds that an order is not necessary to ensure compliance with the restitution order that was ordered by the Court.

C. THE COURT LACKS SUBJECT MATTER JURISDICTION TO MODIFY THE IRS ASSESSMENT OR STAY THE IRS'S ASSESSMENT OR COLLECTION EFFORTS.

 Rubenstein makes several complaints throughout his briefs about the amount assessed by the IRS. The Court agrees with the government that, having concluded the IRS's assessment and collection efforts do not violate the Double Jeopardy or Ex Post Facto clauses, it does not have jurisdiction to consider these complaints at the present time. District courts may only provide relief to individuals challenging IRS assessments after those individuals have exhausted administrative remedies, which require paying the tax deficiency in full. 26 U.S.C. § 7422(a) ("No suit or proceeding shall be maintained in any court for the recovery of any ... tax alleged to have been erroneously or illegally assessed or collected ... until a claim for refund or credit has been duly filed with the [IRS]."); *see Flora v. United*

*States*, 362 U.S. 145, 146, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). Rubenstein has not exhausted the IRS's administrative remedies and, therefore, the Court is prohibited from providing relief of the assessment and collection efforts at this time.

■ Relatedly, the Court lacks jurisdiction to stay the IRS's assessment and collection efforts under the Anti–Injunction Act, which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person . . . ." 26 U.S.C. § 7421(a). Again, Rubenstein is required to exhaust the administrative remedies available to him, and the Court is not permitted to restrain the IRS's assessment or collection efforts.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the IRS's assessment and collection efforts pursuant to § 6201(a)(4) on the interest owed by Rubenstein for the tax years ending in 1997, 1998, 1999, and 2000 do not violate the Ex Post Facto or Double Jeopardy clauses of the United States Conclusion. Further, the Court concludes that the assessment and collection efforts do not render the government in breach of the plea agreement in this case. Finally, with respect to disputes about the amount of the assessment, the Court lacks subject matter jurisdiction at this juncture to modify the IRS assessment or stay its collection efforts because Rubenstein has not exhausted his administrative remedies. As such, Rubenstein's motion is denied in its entirety.

SO ORDERED.